IN THE

# ARIZONA COURT OF APPEALS
DIVISION TWO

———————————

THE STATE OF ARIZONA,
*Appellee*,

*v.*

SERGIO ARTURO ROJO-VALENZUELA,
*Appellant*.

No. 2 CA-CR 2013-0279
Filed September 23, 2014

———————————

Appeal from the Superior Court in Pima County
No. CR20123276001
The Honorable Richard D. Nichols, Judge
The Honorable Scott Rash, Judge

**AFFIRMED**

———————————

COUNSEL

Thomas C. Horne, Arizona Attorney General
Joseph T. Maziarz, Section Chief Counsel
By David A. Simpson, Assistant Attorney General, Phoenix
*Counsel for Appellee*

Isabel G. Garcia, Pima County Legal Defender
By Scott A. Martin, Assistant Legal Defender, Tucson
*Counsel for Appellant*

**OPINION**

Judge Espinosa authored the opinion of the Court, in which Presiding Judge Miller and Chief Judge Eckerstrom concurred.

E S P I N O S A, Judge:

**¶1**        After being convicted of attempted first-degree murder and aggravated assault with a deadly weapon, Sergio Rojo-Valenzuela (Valenzuela) was sentenced to two concurrent prison terms of eleven years each.  On appeal, he seeks a new trial or new *Dessureault*[1] hearing, arguing the trial court erred by admitting evidence pertaining to his pretrial identification by a police officer and by inaccurately instructing the jury on attempted first-degree murder.  We affirm.

**Factual and Procedural Background**

**¶2**        One night in August 2012, police responded to an emergency call from a car wash where Valenzuela and two other men had been seen displaying guns and acting "a little crazy."  As Tucson Police Officer Winans arrived at the scene, Valenzuela and the two men sped away in a dark-colored sport utility vehicle and several police cars pursued.  Following a high-speed chase through a residential neighborhood, the SUV came to a stop and the occupants fled on foot.  Officer Wolfe continued to chase Valenzuela in his patrol car, but was forced to stop when Valenzuela scaled a wall surrounding a residence.  As Wolfe started to get out of his vehicle, shots were fired striking the hood of the car and the front windshield just above the steering wheel.  Although Wolfe took note of the shooter's build and clothing, he did not see his face, and none of the other officers witnessed the shooting.  However, a video

---

[1]*State v. Dessureault*, 104 Ariz. 380, 384, 453 P.2d 951, 955 (1968) (trial court must conduct evidentiary hearing upon challenge to proposed in-court identification).

camera mounted on Wolfe's dashboard recorded the entire event, including the moment when the gunman fired five rounds at Wolfe from behind the wall.

¶3 Police immediately set up a "containment" area that consisted of an inner and outer "quadrant" and began patrolling the neighborhood in search of the shooter. Valenzuela was discovered hiding under a van parked outside a residence within the inner quadrant. Another suspect was detained several blocks away in the outer quadrant. After arrests were made, Officers Winans and Wolfe participated in a series of show-ups with Valenzuela and the second suspect. Winans was unable to positively identify either individual, but Wolfe identified Valenzuela as the shooter based on his clothing, shoes, and physical stature.

¶4 Before trial, Valenzuela moved to suppress any pretrial and in-court identifications and requested a *Dessureault* hearing "to protect his due process rights to a fair identification procedure." The trial court held a hearing but ultimately denied the motion to suppress, finding that Officer Wolfe's identification was not a "typical identification that would be the subject of a suppression motion." The court made no findings concerning the suggestiveness or reliability of the identification, concluding instead that Wolfe's "use [of] the word 'identification' . . . [wa]s more of a shorthand description of his reaction to seeing someone of a similar size and similar clothing." The case proceeded to trial, and Valenzuela was found guilty by a jury and sentenced as set forth above. We have jurisdiction over his appeal pursuant to A.R.S. §§ 12–120.21(A)(1), 13–4031, and 13-4033(A).

## Discussion

**Pretrial Identification Procedure**

¶5 Valenzuela urges us to reverse and remand for a new trial or new *Dessureault* hearing based on the trial court's admission of Officer Wolfe's pretrial identification testimony. He challenges the court's conclusion that Wolfe's identification was an atypical one requiring no evaluation under the due process clause. Had the court engaged in the proper analysis, he argues, it would have concluded

that the show-up identification was both unduly suggestive and unreliable and that his pretrial and in-court identifications should be suppressed. The state concedes that Wolfe's initial identification was inherently suggestive and that it should have been subjected to a due process analysis, but argues the court's ruling may be upheld because the suggestive identification procedure was necessary under the circumstances and Wolfe's identification was reliable.[2]

¶6 We review the trial court's ruling for a clear abuse of discretion, *State v. Lehr*, 201 Ariz. 509, ¶ 46, 38 P.3d 1172, 1183 (2002), deferring to factual findings unless "clearly erroneous," *State v. Forde*, 233 Ariz. 543, ¶ 28, 315 P.3d 1200, 1213 (2014); *State v. Moore*, 222 Ariz. 1, ¶ 17, 213 P.3d 150, 156 (2009). The ultimate question of constitutionality, however, is a mixed question of law and fact that we review *de novo*. *Moore*, 222 Ariz. 1, ¶ 17, 213 P.3d at 156, *citing Sumner v. Mata*, 455 U.S. 591, 597 & n.10 (1982). When analyzing a claim of error in this context, we consider only the evidence presented at the suppression hearing. *Id.*

¶7 The due process clause of the Fourteenth Amendment requires that police identification procedures be conducted "in a manner that is fundamentally fair and secures the suspect's right to a fair trial." *Lehr*, 201 Ariz. 509, ¶ 46, 38 P.3d at 1183; *see* U.S. Const. amend. XIV, § 1. To that end, courts have imposed limits on the admission of such identifications conducted under suggestive circumstances that may "lead[] the witness to identify a particular person as the perpetrator of a crime." *Perry v. New Hampshire*, ___ U.S. ___, ___, 132 S. Ct. 716, 720 (2012).

¶8 In *State v. Dessureault*, 104 Ariz. 380, 384, 453 P.2d 951, 955 (1968), our supreme court set forth the procedure to be followed when a proposed in-court identification has been challenged on grounds that it will be tainted by an unduly suggestive pretrial identification method. First, a hearing must be held "to determine

---

[2]The state also argued that any error was harmless because Wolfe's identification was corroborated by DNA evidence and by video footage taken from his patrol car's dashboard-mounted camera. Our reliability determination, however, renders analysis of this issue unnecessary.

from clear and convincing evidence whether [the prior identification] contained unduly suggestive circumstances." *Id.* at 384, 453 P.2d at 955. If the prosecution fails to establish that the identification was not unduly suggestive, it may then attempt to prove that the proposed in-court identification is not tainted. *Id.* If the court finds the in-court identification admissible on that basis, upon request it must provide a cautionary jury instruction concerning the relationship between the pretrial and in-court identifications. *Id.*

¶9 While the procedures set forth in *Dessureault* still govern a defendant's challenge to the admission of identification evidence, the analysis has been altered slightly to incorporate subsequent developments in constitutional law. Significantly, we now recognize that a defendant's due process rights will not be violated by the admission of evidence concerning an unduly suggestive—but nevertheless reliable—pretrial identification. *See, e.g.*, *State v. Williams*, 144 Ariz. 433, 440, 698 P.2d 678, 684 (1985) (well-established that "'[t]he admission of testimony concerning a suggestive and unnecessary identification procedure does not violate due process so long as [it] possesses sufficient aspects of reliability'"), *quoting Manson v. Brathwaite*, 432 U.S. 98, 106 (1977); *see also Perry*, ___ U.S. at ___, 132 S. Ct. at 720 (if "indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances," identification evidence "ordinarily will be admitted").

¶10 A pretrial identification found to be "unduly suggestive," will be screened for reliability under the factors articulated by the Supreme Court in *Neil v. Biggers*, 409 U.S. 188 (1972). *See, e.g.*, *Moore*, 222 Ariz. 1, ¶¶ 15-16, 32, 213 P.3d at 156, 158; *Lehr*, 201 Ariz. 509, ¶ 48, 38 P.3d at 1183; *Williams*, 144 Ariz. 433, 439-40, 698 P.2d 678, 684-85. Such factors

> include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the

confrontation, and the length of time
between the crime and the confrontation.

*Biggers*, 409 U.S. at 199-200. As the state notes, these factors are "non-exclusive," and, at times, our analysis may be informed by other indicia of reliability or lack thereof. *See State v. Fierro*, 166 Ariz. 539, 546-47, 804 P.2d 72, 79-80 (1990) (relying in part on extensive cross-examination of witness); *State v. Nieto*, 118 Ariz. 603, 605, 578 P.2d 1032, 1034 (App. 1978) (noting *Biggers* factors are "not exclusive").

¶11 We agree with both parties that the trial court erred by concluding Officer Wolfe's identification was not subject to a *Dessureault* analysis. As the state acknowledges, "[t]he mere fact that an identification is based on a suspect's build and clothing—as opposed to the suspect's face—does not exempt the identification from due process analysis."[3] *State v. Trujillo*, 120 Ariz. 527, 530, 587 P.2d 246, 249 (1978) (applying *Biggers* factors to analyze identification based on physical stature, clothing, and length of hair); *see also Willis v. Garrison*, 624 F.2d 491, 494 (4th Cir. 1980) (*Biggers* factors applied to identification based on height, weight, clothing, and complexion). Accordingly, Wolfe's pretrial and in-court identifications should have been admitted only if they satisfied the requirements of due process set forth above to be admissible at trial.

¶12 The state concedes that the one-man show-up procedure employed here was "inherently suggestive," *see, e.g.*, *Williams*, 144 Ariz. at 439, 698 P.2d at 684, but relies on the nature of Valenzuela's crime to argue that it was not "unduly" so. Emphasizing law enforcement's pressing need to capture a suspect who had fired on a police officer and taken flight in a residential neighborhood, the state argues the necessity of the show-up rendered a reliability analysis unnecessary. It fails, however, to cite any Arizona authority for the proposition that due process

_____

[3]While we take no position on whether an identification based solely on the suspect's clothing implicates due process, we note that several courts have rejected this view. *See Johnson v. Ross*, 955 F.2d 178, 180-81 (2d Cir. 1992); *People v. Legore*, 996 N.E.2d 148, 154-55 (Ill. App. Ct. 2013).

violations associated with suggestive identifications can be cured by evidence of exigent circumstances. Nor is it explained how this notion can be reconciled with binding authority identifying reliability as the "'linchpin'" of admissibility when law enforcement officers employ improper identification procedures. *Lehr*, 201 Ariz. 509, ¶ 46, 38 P.3d 1172, 1183, *quoting Brathwaite*, 432 U.S. at 114.

**¶13**        Indeed, the state's contention is inconsistent with our supreme court's reasoning in *State v. Hoskins*, 199 Ariz. 127, ¶ 35, 14 P.3d 997, 1008-09 (2000), which involved the use of a show-up identification of an individual suspected of kidnapping an eighteen-year-old girl. In *Hoskins*, the state argued that the defendant had "no constitutional right to a physical line-up" and that one-man show-ups were permissible under state law. *Id.* ¶ 33. At the time the show-up was conducted, the victim was still missing. The court observed that the show-up was justified under the circumstances, but it went on to conclude, based on its examination of the *Biggers* factors, that the identification was properly admitted based on its reliability. *Id.* ¶¶ 31, 34-35.

**¶14**        Given that exigent circumstances attend many if not most suggestive police show-ups, it follows that a reliability analysis would rarely be required if exigency alone could justify the admission of suggestive identifications. We are therefore reluctant to reach such a conclusion in the absence of further guidance from the Arizona or United States Supreme Court. In any event, the state presented no evidence at the *Dessureault* hearing concerning the necessity of the particular procedure, or the reasons it could not have taken measures to make the show-up less suggestive.

**¶15**        Accordingly, we turn to the question of whether the trial court's ruling should be affirmed on the basis of reliability.[4]

---

[4]Valenzuela argues this analysis should not be conducted for the first time on appellate review. However, as he acknowledges, reviewing courts in this state have evaluated reliability in the first instance where necessary. *See Williams*, 144 Ariz. at 440-41, 698 P.2d at 685-86. Moreover, this court has previously determined that *Dessureault* allows us to undertake an admissibility analysis for the

Although Officer Wolfe's opportunity to view Valenzuela was brief, beginning just after Valenzuela fled from the Jeep and lasting only until he scaled the wall, Wolfe was a fairly short distance away—"twenty to thirty feet," by his account—and the area was illuminated by his squad car's spotlight. The short duration of Wolfe's observation was more than offset by his degree of attention at that point. *See State v. McLoughlin*, 133 Ariz. 458, 462, 652 P.2d 531, 535 (1982) (identification reliable notwithstanding short duration of observation where witnesses "had a reason to have their attentions riveted on [the suspect]"); *Trujillo*, 120 Ariz. 527, 530, 587 P.2d 246, 249 (reliability established where witness had only seconds to view defendant but "her attention was immediately drawn" to him). The record of the suppression hearing demonstrates that Wolfe's focus was solely on Valenzuela and that he had been trained to take note of a suspect's clothing and build while in pursuit.

¶16 Officer Wolfe also testified about information he had provided over the radio immediately after shots had been fired, before the suggestive show-up occurred. He described the suspect as "a male wearing all black clothing and . . . of thin build, short stature." Evidence in the record established that this description matched Valenzuela's appearance on the night of the shooting. *See Moore*, 222 Ariz. 1, ¶ 26, 213 P.2d at 157 (comparing description provided before suggestive procedure to evidence of defendant's appearance). Wolfe's "99 percent" level of certainty in his identification—which he attributed to his observations regarding Valenzuela's physical build, pants, and distinctive shoes—and the passage of no more than six hours between Wolfe's confrontation and his identification also support a finding of reliability. Thus, we conclude the foregoing factors are sufficient to determine by clear and convincing evidence that Wolfe's pretrial and in-court

---

first time on appeal. *See State v. Leyvas*, 221 Ariz. 181, n.6, 211 P.3d 1165, 1174 n.6 (App. 2009) ("[I]t is highly preferable for the trial court to rule on the issues of taint and reliability . . . [b]ut if the appellate court can determine 'from the record on clear and convincing evidence that the in-court identification was not tainted by the prior identification procedures . . . the conviction will be affirmed.'"), *citing Dessureault*, 104 Ariz. at 384, 453 P.2d at 955.

identifications were reliable and admissible. That the jury also viewed video footage corroborating Wolfe's description and was instructed on the reliability of in-court identifications only reinforces our conclusion that any weaknesses in his testimony were matters of weight for the jury. *See Moore*, 222 Ariz. 1, ¶ 29, 213 P.3d at 158.

**Out of Court Statements**

**¶17**         Valenzuela next contends that testimony by Detective Gonzalez, who brought Officer Wolfe to the show-up, regarding Wolfe's statement at that time "was classic hearsay" and that the trial court abused its discretion when it admitted the testimony over Valenzuela's objection. The state responds that the detective's testimony was admissible pursuant to Ariz. R. Evid. 801(d)(1)(C), which classifies as non-hearsay any statement of identification made by a declarant-witness who is subject to cross-examination. Valenzuela concedes in his reply that this subsection applies to "statements of identification . . . conducted in a constitutional manner," and that the "Rule 801(d)(1)(C) hearsay exemption [applies] to [the detective's] testimony about Officer Wolfe's statement," to the extent Wolfe's identification comported with due process. We agree, and incorporating our due process analysis above, conclude that Gonzalez's testimony regarding Wolfe's identification was properly admitted.

**Jury Instruction**

**¶18**         Finally, Valenzuela argues that the trial court's jury instruction on attempted first-degree murder constituted fundamental error. He maintains the court's use of the term "the crime" or "a crime" in describing the elements of attempt was impermissibly vague because it allowed the jury to find him guilty of attempted first-degree murder if it found that he had attempted to commit any crime, not just first-degree murder.[5] The state disputes

---

[5]The trial court's instruction provided:

The crime of attempted first degree murder requires proof that the Defendant:

his characterization of the instruction, insisting "the crime" referenced in the instruction can only be interpreted to mean first-degree murder "and not some hypothetical other crime."

**¶19**    We review the legal adequacy of a jury instruction *de novo*. *State v. Martinez*, 218 Ariz. 421, ¶ 49, 189 P.3d 348, 359 (2008). In doing so, we view the instructions in their entirety to determine whether they accurately reflect the law, *State v. Rutledge*, 197 Ariz. 389, ¶ 15, 4 P.3d 444, 448 (App. 2000), and interpret the instruction as a reasonable juror would, *cf. State v. Abdi*, 226 Ariz. 361, ¶ 9, 248 P.3d 209, 212 (App. 2011) (interpreting jury instruction dealing with state's burden of proof). Applying these standards, we conclude that no reasonable juror would have interpreted the court's instruction on attempted first-degree murder as permitting a guilty verdict based on a finding that he had been attempting to commit another crime, given the content of the instruction and its juxtaposition with an instruction on the substantive crime of first-degree murder.

**¶20**    And even were we to find error in the court's instruction, Valenzuela has failed to establish any resulting prejudice. *See State v. Henderson*, 210 Ariz. 561, ¶¶ 19–20, 115 P.3d 601, 607 (2005). In evaluating the impact of an allegedly erroneous jury instruction, we will, along with other factors, consider the statements of counsel. *State v. Valverde*, 220 Ariz. 582, ¶ 16, 208 P.3d 233, 237 (2009). Here, the prosecutor focused on the connection between the charge of attempted first-degree murder and

---

(1) Intentionally engaged in conduct that would have been a crime if the circumstances relating to the crime were as the Defendant believed them to be; or

(2) Intentionally committed any act that was a step in a course of conduct that the defendant believed would end in the commission of a crime; or

(3) Engaged in conduct intended to aid another person to commit a crime, in a manner that would make the Defendant an accomplice, had the crime been committed or attempted by the other person.

Valenzuela's intent to commit first-degree murder throughout his closing:

> There is no question the person that shot at [the officer] is guilty of [aggravated assault]. And the same with the attempted first degree murder. . . . [Y]ou saw where that bullet went through Officer Wolfe's car. . . . Those aren't lucky shots. That is someone [who] is trying to kill an officer . . . .
>
> . . . .
>
> Premeditation doesn't mean that the Defendant, you know, sat at home and made a list of ways that he was going to kill Officer Wolfe on August 12th of 2012 because premeditation is any amount of time for reflection . . . . That's all that is required on attempted first degree murder . . . .
>
> . . . .
>
> From the first shot, [Valenzuela] was—he reflected on killing that officer, but certainly by the 5th, yeah, that's time for reflection and that is premeditation and that is attempted murder.

There is nothing in these statements to suggest that the jury could find Valenzuela guilty of attempted first-degree murder based on an intent to commit any other crime. Accordingly, we conclude that the alleged instructional error could not have prejudiced Valenzuela and reject his claim for relief on this ground.

## Disposition

¶21 For all of the foregoing reasons, Valenzuela's convictions and sentences are affirmed.